Filed 3/27/15  P. v. Mitchell CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>AARON JAVON MITCHELL,<br><br>    Defendant and Appellant. | B252808<br><br>(Los Angeles County<br>Super. Ct. No. YA081154) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge.  Affirmed as modified with directions.

Lynette Gladd Moore, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle, Deputy Attorney General, and Pamela C. Hamanaka, Assistant Attorney General, for Plaintiff and Respondent.

Defendant and appellant, Aaron J. Mitchell, appeals his conviction for premeditated attempted murder, assault with a firearm (2 counts), and shooting at an occupied motor vehicle, with criminal street gang, great bodily injury and firearm use enhancements (Pen. Code, §§ 664, 187, 245, 246, 186.22, subd. (b), 12022.7, 12022.53).[1] He was sentenced to state prison for a term of 31 years to life, plus life.

The judgment is affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

    a. *The shooting.*

On March 4, 2011,[2] at around 9:00 p.m., Erneshia T. arrived at the corner of 108th Street and Western Avenue inside her sister-in-law's Volkswagen Beetle. Erneshia was in the front passenger seat, her sister-in-law was driving, and her sister-in-law's baby was in the back. Also in the back was a dog inside a cage. Erneshia's sister-in-law parked near a laundromat which had bright lights. Erneshia called her son, Kameron, who was in an apartment in an adjacent building to come help unload the dog cage.

As Kameron and Erneshia were struggling to get the cage out of the car, they were approached by defendant Mitchell, who addressed Kameron with a "What's up" head gesture. When Kameron did not respond, Mitchell said: "What's up, hood, where you from? Neighborhood 90." Kameron was looking at Mitchell "face to face" in the illumination of flood lights that were mounted on top of the laundromat building.

Kameron again did not say anything. Instead, he looked over at his mother. Erneshia testified her attention had been drawn to Mitchell when he asked Kameron where he was from "[b]ecause I knew something wasn't right when he said that. So . . . I

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] All further date references are to the year 2011 unless otherwise specified.

2

immediately looked over at him and told him that no one gang bangs. We all family over here." Erneshia looked right into Mitchell's eyes as she spoke to him.

Mitchell's hands were inside the pocket of his hoodie. He replied, "Fuck that" to Erneshia's statement that "no one gang bangs," pulled out a silver handgun and started shooting. Mitchell shot at Kameron, who was standing behind Erneshia. A bullet hit Kameron in the mouth, knocking him to the ground. Erneshia jumped in front of Kameron and held her hands out to protect him. The Beetle had been parked in such a way that there was an open car door between Mitchell and Kameron, so Mitchell shot underneath the car door at Kameron who could see Mitchell's face through the open window. Mitchell was only four or five feet from him at this point. Kameron got up and ran. After Kameron escaped, Mitchell shot at Erneshia, hitting her in the foot. Mitchell then ran off.

The Beetle had been hit by gunfire. Kameron had been shot in the mouth, twice in the chest, twice in the buttocks, once in the left leg above the kneecap, and once in the right ankle.

b. *The investigation.*

On March 8, Los Angeles County Sheriff's Detective Eric McDonagh, who worked as a gang investigator, went to the crime scene. Mounted on the outside of the laundromat, there was a video surveillance camera that faced the street. Footage from this camera had recorded the shooting, but the gunman's image was too indistinct to be identifiable. There was a second camera located inside the laundromat, but this one had not been set up to record anything that happened out in the street. McDonagh recovered expended bullet casings from the sidewalk, but no gun was ever found.

On March 9, McDonagh talked to Erneshia on the telephone. She described the gunman as being 5'5" to 5'6" tall, 18 to 25 years old, with a medium build, dark skin, and short hair.

On March 23, McDonagh spoke to Kameron by telephone. Kameron described the gunman as 5'9" to 5'11" tall, 140 to 150 pounds, with a dark complexion and a short Afro haircut.

3

On April 12, McDonagh showed photo arrays, separately, to Erneshia and Kameron. Erneshia viewed two six-packs and selected Mitchell's photograph from one of them. She testified she recognized him "[j]ust by looking at him, his eyes." She told McDonagh that Mitchell looked younger in the photograph than he had during the shooting. She did not identify anyone in the other six-pack. Erneshia also viewed a binder containing about 50 photographs, but she did not see the gunman in any of those pictures.[3]

Kameron also picked out Mitchell's picture from a six-pack photo array. McDonagh testified Kameron's identification was "pretty immediate," that he "looked at the photo. His eyes got big and he looked at the photo, and he circled it." Kameron testified he recognized Mitchell's picture because of his eyes and facial structure. He, too, told Detective McDonagh that Mitchell looked younger in the picture than on the night of the shooting.

On April 21, McDonagh met separately with Erneshia and Kameron again because he wanted to show them six-packs that included a photograph in which Mitchell looked older. Erneshia and Kameron again identified Mitchell as the gunman.

On May 19, McDonagh executed a search warrant at Mitchell's house. He recovered a black hoodie that matched the description given by Erneshia and Kameron. Mitchell was arrested.

In the search warrant affidavit, written on May 16, McDonagh stated Erneshia had described the gunman as 5'8" to 5'10" tall and 18 to 20 years old. McDonagh acknowledged having testified Erneshia also told him the gunman was 18 to 25 years old and 5'5" to 5'6" tall. McDonagh explained this height discrepancy by testifying Erneshia had told him on other occasions the gunman was 5'8" to 5'10" tall. McDonagh

_____

[3] McDonagh testified he did not recall bringing a binder of photographs to Erneshia's house, but if he did it would have been a Crips gang book because the 111 Neighborhood, 115 Neighborhood, and Block Crips were gangs that congregated in the area where the shooting occurred. McDonagh did not recall Erneshia identifying anyone in a photograph binder, but if she had he would have notified the appropriate parties.

acknowledged the search warrant affidavit stated Kameron had described the gunman as weighing 130 to 150 pounds, although Kameron's description in McDonagh's police report said 140 to 150 pounds. McDonagh testified Kameron had given different accounts at different times.

On October 17, at the men's central jail, Erneshia and Kameron picked out Mitchell from live lineups. In March 2012, they identified Mitchell at the preliminary hearing.

c. *The gang evidence.*

Kameron testified Neighborhood 90, the gang Mitchell had mentioned just before he started shooting, was a Crips gang active in the local area. The local gangs were the 90 Neighborhood Crips, the 111 Neighborhood Crips, and the Rollin 100's Block Crips. Crips gang members tended to wear the color blue. Kameron had been wearing blue jeans and a shirt with blue in it on the day of the shooting. He could tell Mitchell was trying to figure out if Kameron was from the area, and that Mitchell himself was not from the Neighborhood 90 Crips: a Neighborhood 90 gang member would not come to Rollin' 100's territory and make this kind of challenge because the two gangs got along.

Inglewood Police Detective Kerry Tripp worked in a gang intelligence unit. As far as African-American gangs were concerned, Inglewood was a Bloods town as opposed to a Crips town. One of the Inglewood Bloods gangs was the Avenue Piru, which had at least 50 members and had been around since the late 1980's. Bordering on Inglewood were areas controlled by various Neighborhood Crips gangs, including the 111 Neighborhood Crips, 90 Neighborhood Crips, Rollin 60 Crips, Block Crips, Underground Crips and Rollin 100 Crips. All these Crips gangs were enemies of the Avenue Piru gang.

Avenue Piru members wore the color red, the letters "A" or "P," and sometimes a California Angels hat. Their primary activities included murders, shootings, robberies, drug possession and sale, and weapons possession. Over the years, Tripp had spoken to a few hundred Avenue Piru members and investigated more than 50 crimes in which Avenue Piru members had been suspects. He had read all the Inglewood police reports

5

regarding the Avenue Piru gang, reports from other law enforcement agencies, and spoken to other police officers about the gang. When contacts were made with individuals on the street, field interview cards were filled out, which included information such as tattoos, reason for the stop, gang affiliation, etc.

The shooting in this case occurred in Neighborhood Crips gang territory. Tripp testified a liquor store at the corner of 108th and Western, near the laundromat in front of which the shooting had taken place, often "gets tagged up. What I mean by 'tagged up,' there's graffiti written from Neighborhood Crips claiming that territory, and you oftentimes see them writing 'APG,' which is Avenue Piru gang, and they'll have that crossed out. And oftentimes in that same liquor store, Avenue Piru Bloods are coming over, and they're crossing out 'Neighborhood Crips' and putting their name up there." The liquor store was less than a mile from Avenue Piru territory.

The following colloquy occurred:

"Q. And what's the significance of an Avenue Piru gang member being at that location, being in the rival Crip[s] territory?

"A. The significance is they're looking for enemies. Gang members commit crimes of opportunity as they present themselves. And that's a crime of opportunity. You happen to see somebody out. They happen to be between the ages of what gang members are, somewhere between the ages of 14 and 45. He fits the general race of the majority of the people in that gang, sees that person as a rival and shoots them.

"Q. Does it affect your opinion [i.e., that this shooting had been committed for the benefit of the Avenue Piru gang] that the shooter in the hypothetical doesn't verbally say something to the effect of Avenue Piru Gang or Avenue Piru Bloods when he commits those crimes?

"A. No.

"Q. Why not?

"A. You don't have to say Avenue Piru Blood[s] in order to commit a crime. The mere fact that he's an Avenue Piru Blood[s] gang member in rival territory shooting at what he believes to be a rival gang member or somebody who fits the general age and

6

description of a rival gang member in rival gang territory is more than enough. Whether he . . . yells out his gang name, whether he's wearing all red or not."

Tripp testified it was not at all unusual for a gang member to pretend to belong to a rival gang: "[T]hey do that because they're trying to find out if this person is actually a gang member. [¶] Oftentimes, for example, a Blood[s] gang member will go into a Crip[s] territory . . . and say, 'Where you from, homey? This is 90.' And trying to see what kind of reaction they get from this person. If this person lives in that kind of a neighborhood, they're hoping that this person will acknowledge . . . that he's a Crip[s] gang member by saying what gang he's from or throwing up a hand sign. And that would be a way for this rival gang member to positively, in his mind, assume that this person is a rival gang member and then attack that person."

Although Tripp had never personally spoken to Mitchell, he was acquainted with him "through photographs, talking to other officers, [field interview] cards, police reports, and this case." In his opinion, Mitchell was a gang member. This was based on Mitchell's gang tattoos, information from the field interview cards, police reports, and speaking with other officers to whom Mitchell had admitted his gang membership. The tattoos on Mitchell's hands – he had an "A" on his right hand and a "P" on his left hand – signified he was an Avenue Piru member.

Based on the facts of this case, Tripp opined the crimes had been committed to benefit the Avenue Piru gang. Mitchell was an Avenue Piru gunman in territory belonging to the rival Neighborhood Crips. He approached Kameron, who could have been a gang member given his age and race, and asked where he was from in order to determine if he belonged to an enemy gang. The shooting would have benefitted Avenue Piru even if Kameron was not a gang member because Neighborhood Crips members in the area would learn of it, thus instilling fear and intimidation. Also, younger Avenue Piru members would learn about the shooting and the recognition the perpetrator had gained thereby, which would encourage them to commit similar crimes.

Tripp told Detective McDonagh he thought the gunman belonged to either the Inglewood Family or the Avenue Piru gang. That was "[b]ecause at the time [of this

7

shooting] there was a gang war going on between the Neighborhood Crips and the Blood[s] gangs in the City [of] Inglewood. There were so many shootings and homicides that we actually got [a] multi-task force with ourselves, L.A. Sheriff's and L.A.P.D. to combat these crimes. [¶] So when this crime occurred in the location it occurred, I spoke with Detective McDonagh, and I told him I believe this is probably Inglewood Family or more than likely Avenue Piru Bloods. [¶] I gave him a list of names of people from Avenue Piru Bloods who I thought were the shooters in the gang and gave that to him, and then he conducted his investigation and came up with the suspect."

2. *Defense evidence.*

Mitchell testified that on March 4, the date of the shooting, at about 9:00 p.m., he was at a friend's house at 104th and Crenshaw getting ready for a party. His friends, including Aaron Parker and Jeoni Hill, were there. Mitchell testified he particularly remembered that night because Hill was shot at about 9:30 p.m. The police and an ambulance arrived. Mitchell himself went to the hospital at 10:30 p.m. He denied having been at 108th Street and Western Avenue that night, or having shot at Erneshia and Kameron.

After his arrest, Mitchell spoke to his girlfriend, telling her that he remembered his friend had been shot on March 4. However, Mitchell admitted on cross-examination that the person he told his girlfriend about was not Hill but someone else, a man named Devontae Harrell. Mitchell testified he thought Harrell had gotten shot in March, but it actually might have occurred in April.

Mitchell denied being either a member of the Avenue Piru gang or associating with them. The "A" and "P" tattoos on his hands stood for the initials of his best friend, Aaron Parker. The black sweatshirt police took from his house when he was arrested belonged to his sister. Mitchell testified his name had been entered onto a field interview card in 2008 when he was at a friend's house; the police had come and detained everyone, but he was not arrested or accused of doing anything wrong.

Nicole Washington testified that on March 4, between 8:45 and 9:15 p.m., she was in Eddie's Liquor store at the corner of 108th Street and Western Avenue. As she was

8

walking up to the register she heard gunshots. Going to the liquor store's front door, she saw an African-American man in a dark hoodie walk across the parking lot. She could not see the man's face because the hoodie was over his head. Washington described the man as "between five-six and five-eight, five-five, five-seven," but testified she was "not really good at heights."

3. *Rebuttal evidence.*

When Mitchell was arrested in May 2011, McDonagh asked him about the March shooting in front of the laundromat near the corner of 108th Street and Western Avenue. Mitchell said he had been in Lancaster the entire month of March and did not return until March 31. A tape recording of this exchange was played for the jury.

## CONTENTIS

1. The trial court erred by denying Mitchell's post-conviction *Pitchess*[4] motion.

2. There was insufficient evidence to support the gang enhancement.

3. The trial court improperly sentenced Mitchell for a great bodily injury enhancement.

## DISCUSSION

1. Pitchess *motion was properly denied.*

Mitchell contends the trial court erred by denying his post-conviction *Pitchess* motion for discovery of Detective McDonagh's personnel file. This claim is meritless.

a. *Background.*

After the jury returned the guilty verdicts, but before sentencing, Mitchell filed a motion seeking *Pitchess* discovery "relating to accusations that [McDonagh] engaged in acts of bias, dishonesty, coercive conduct or acts constituting a violation of the statutory or constitutional rights of others." (Fns. omitted.) Defense counsel declared this discovery would assist in preparing post-trial motions claiming McDonagh had:

---

[4] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

9

(1) "testified . . . that he destroyed potential *Brady*[5] evidence by 'recycling' [or throwing away] photos shown to eyewitnesses"; (2) "testified that he viewed video tapes of the interior of the business where the shooting occurred, and failed to preserve the evidence, again essentially destroying potential *Brady* material," and (3) "testif[ied] . . . that he lied or perjured himself in the sworn affidavit for the search warrant." This last claim alleged that McDonagh had "skewed all of the physical descriptions" of the gunman in order to achieve "a high level of consistency between what the witnesses saw and the suspect he wished to obtain the warrant for. The actual physical descriptions provided by three . . . percipient witnesses were different from one another, and very different from the physical description of the 'suspect.' " Defense counsel declared: "Based upon the aforementioned testimony at trial, and McDonagh's admission that he lied or perjured himself in the sworn affidavit for the search warrant, the defense alleges that the detective's testimony and investigation of the case are false and fabricated. He fabricated probable cause."

The Los Angeles County Sheriff's Department opposed *Pitchess* discovery on the ground Mitchell's motion failed to make any claims of actual police misconduct. The opposition asserted: (1) McDonagh had merely discarded those six-pack photo arrays that had not resulted in any identifications, while preserving all the six-packs in which a witness had identified Mitchell; (2) the surveillance videotape from inside the laundromat was not preserved because McDonagh had watched it and determined it did not show what was going on outside in the street, which is where the shooting occurred; and (3) the search warrant affidavit was not dishonest because McDonagh had been given "varying information from witnesses regarding the suspect's physical description and the detective[ ] gave his best description of the suspect."

At the hearing on Mitchell's *Pitchess* motion, defense counsel essentially conceded that each allegation by itself would be insufficient to justify discovery, but

---

5    *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (prosecution has duty to disclose exculpatory evidence to defendant).

argued the trial court should "combine all of those things." When the court asked defense counsel to point out where in the trial transcript McDonagh admitted having lied or perjured himself in the search warrant affidavit, defense counsel could not do so and the following colloquy occurred:

"[Defense counsel]: Your Honor, it may be a misquote or it may be a conclusion based on what I saw. I'm not going to stand here and say that he specifically stated, 'Yes, I lied.'

"The Court: That's what your affidavit –

"[Defense counsel]: Well, I probably should have proofread it better."

The trial court denied Mitchell's *Pitchess* request, saying: "The declaration is insufficient to justify discovery of police personnel records."

### b. *Legal principles.*

"Evidence Code sections 1043 and 1045, which codified our decision in *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 . . , allow discovery of certain relevant information in peace officer personnel records on a showing of good cause. Discovery is a two-step process. First, defendant must file a motion supported by declarations showing good cause for discovery and materiality to the pending case. [Citation.] This court has held that the good cause requirement embodies a 'relatively low threshold' for discovery and the supporting declaration may include allegations based on 'information and belief.' [Citation.] Once the defense has established good cause, the court is required to conduct an in camera review of the records to determine what, if any, information should be disclosed to the defense. (Evid. Code, § 1045, subd. (b).) The statutory scheme balances two directly conflicting interests: the peace officer's claim to confidentiality and the defendant's compelling interest in all information pertinent to the defense. [Citation.]" (*People v. Samuels* (2005) 36 Cal.4th 96, 109.)

The good cause showing required by Evidence Code section 1043 is a "specific factual scenario" establishing a "plausible factual foundation" for the allegations of police misconduct. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 85, 86.) "What the defendant must present is a specific factual scenario of officer misconduct that

11

is plausible when read in light of the pertinent documents." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1025.) "[A] plausible scenario of officer misconduct is one that might or could have occurred. Such a scenario is plausible because it presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges." (*Id*. at p. 1026.)

The trial court's ruling on whether a motion to discover police personnel records has been supported by an affidavit sufficient to show good cause and materiality is reviewed for an abuse of discretion. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 992.) However, "even if the trial court erroneously denies a *Pitchess* motion, reversal is not required unless the defendant can demonstrate prejudice. (See *People v. Samuels, supra,* 36 Cal.4th at p. 110 ["even if the trial court erred because defendant made a showing of good cause in support of his [*Pitchess*] request . . . such error was harmless [under *Watson*[6]]"]; *People v. Memro* (1985) 38 Cal.3d 658, 684, disapproved on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2 ["It is settled that an accused must demonstrate that prejudice resulted from a trial court's error in denying discovery."].)

        c. *Discussion*.

The trial court did not abuse its discretion by denying the *Pitchess* motion because Mitchell failed to present a plausible factual scenario of police misconduct.

As for the discarded photo arrays, it is undisputed that neither eyewitness identified any of those pictures as being the gunman. The photo arrays in which Mitchell's picture had been identified were preserved. Mitchell fails to explain how collections of photographs not resulting in identifications could have been used to show that the actual eyewitness identifications were unreliable.

As for the discarded surveillance videotape, Mitchell argues: "Erneshia said that the shooter came from the laundromat. The video from the exterior of the laundromat . . . did not show the shooter's face. If the same man had appeared in the surveillance video

---

[6]     *People v. Watson* (1956) 46 Cal.2d 818.

of the interior of the laundromat, his face might have been visible – and that evidence might have exonerated appellant." Although it is theoretically possible the videotape from the internal laundromat surveillance camera might have contained a better view of the person recorded on the external camera, the trial record does not show the gunman had in fact come from inside the laundromat.

Erneshia did at one point say the gunman had come "from the laundromat," but she later backed away from this characterization and the clear thrust of her entire testimony was that she had not even seen the gunman until *after* he spoke to Kameron:

"Q. You testified today that . . . before [the gunman] said anything, you noticed that a guy who was black with a hoodie on had come out from the area of the laundromat; is that correct?

"[The prosecutor]: Objection. Misstates testimony.

"The Court: Sustained.

"[Defense counsel]: One more time.

"Q. When did you first see this person? Before he said anything to you, did you see him?

"A. No.

"Q. So it wasn't until you heard his voice that you looked at him?

"A. Yes.

"Q. Okay. And your testimony today is that he spoke and then you looked at him?

"A. Yes."

Moreover, even if had Erneshia's testimony in this regard been more ambiguous, Detective McDonagh testified he "viewed" the tape from the internal surveillance camera "and *it didn't show anything on the outside*. So I didn't take anything from the inside of the laundromat." (Italics added.) Defense counsel never asked McDonagh for a further explanation of what that meant, and it was Mitchell's burden to "present . . . a specific factual scenario of officer misconduct." (*Warrick v. Superior Court*, *supra*, 35 Cal.4th at

13

p. 1025.)  This notion that the videotape from the internal camera might have contained exculpatory evidence amounts to mere speculation.[7]

Finally, Mitchell asserts McDonagh lied in the search warrant affidavit by deliberately altering witness descriptions of the suspect's height in order to make them "taller – more nearly matching appellant's height."  Mitchell concedes the eyewitnesses had given varying height estimates, with Kameron saying the gunman was 5'9" to 5'11" tall, while Erneshia said 5'5" to 5'6" tall, and Washington said 5'5" to 5'7" tall.  Nevertheless, Mitchell complains that in the search warrant affidavit McDonagh stated Washington told him the man was 5'7" to 5'9" tall, and that McDonagh gave a final description of the gunman as being 5'8" to 5'10" tall.  At the same time, however, Mitchell testified:  "[I]t is certainly true that one of the descriptions that Erneshia gave of the shooter's height was of a man five feet eight inches to five feet ten inches tall."

We fail to see how these physical description discrepancies established that McDonagh purposely wrote a misleading search warrant affidavit.  Mitchell is forgetting the search warrant affidavit was drafted *after* Erneshia and Kameron had already identified Mitchell's face in two different photo arrays, one of which showed Mitchell at a younger age than the other.  In light of this kind of positive identification, we see no evidence of police misconduct arising from these slight discrepancies in the eyewitnesses' height estimates.

Without having established any actual police misconduct, Mitchell falls back on a vague police conspiracy theory.  He argues "the conduct of the investigation seemed to indicate that McDonagh was interested in producing a particular result, not in following the evidence wherever it might lead," and that "[i]t is not farfetched to hypothesize that McDonagh reached a conclusion about which [Avenue Piru] gang member committed the

---

[7]     Mitchell also complains McDonagh recovered his cell phone during the search, but did not utilize available technology to see if this phone had been used in local area around the time of the shooting.  However, this allegation was not mentioned in the *Pitchess* motion and, again, this is merely a complaint about the thoroughness of the investigation.

shooting, then nudged Erneshia and Kameron to support his thesis by identifying appellant."

In *People v. Lewis and Oliver, supra,* 39 Cal.4th 970, a defendant accused of murder "alleged that the detectives were involved in a conspiracy with [his estranged wife] to steal $10,000 and to murder him. He claimed they attempted to murder him by using excessive force during his arrest that would provoke him into defending himself, and that would allow them to apply lethal force in return. He also alleged that the officers were violent men generally, and that they were conspiring to frame him for murders he did not commit." (*Id*. at p. 991.) In ruling the trial court had not abused its discretion by denying Lewis's *Pitchess* motion, our Supreme Court said: "Lewis did not show that a police conspiracy to murder or frame him 'could or might have occurred.' [Citations.] Lewis's moving papers alleged one or more grandiose conspiracies to frame and murder him. The trial court did not abuse its discretion in concluding that Lewis did not meet the standard for permitting discovery of information from police personnel files." (*People v. Lewis and Oliver, supra,* 39 Cal.4th p. 992.)

Although not as elaborate as the police conspiracy alleged in *Lewis*, the scenario Mitchell proposes is no more plausible. He has presented no factual scenario tending to show McDonagh improperly guided the witnesses to identify him as the gunman. Indeed, Mitchell himself even acknowledges, for instance, that Erneshia testified McDonagh "did not suggest to her that she should select a photograph" from the six-pack array. Rather, the evidence tends to show a very clean identification: the two eyewitnesses got an extremely good look at Mitchell in the flood-lit area in front of the laundromat before and after he started shooting; the problem of cross-racial identification was not present; and both eyewitnesses picked Mitchell out of photo arrays on two different occasions.

The trial court did not abuse its discretion by denying Mitchell's *Pitchess* motion.

15

2. *The gang enhancement was properly imposed.*

Mitchell contends the gang enhancement should be vacated because there was insufficient evidence to show he shot at Kameron in order to benefit a criminal street gang. This claim is meritless.

a. *Legal principles.*

"[T]he STEP Act prescribes increased punishment for a felony if it was related to a criminal street gang. (§ 186.22, subd. (b)(1).) '[T]o subject a defendant to the penal consequences of the STEP Act, the prosecution must prove that the crime for which the defendant was convicted had been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1) . . . .) In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a "pattern of criminal gang activity" by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period. (§ 186.22, subds. (e) and (f).)' [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047, fn. omitted.)

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither

16

reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

b. *Discussion*.

Mitchell asserts there was no evidence what the motive for the shooting was. He is wrong. Detective Tripp's testimony constituted substantial evidence that Mitchell belonged to the Avenue Piru gang and carried out this shooting for the gang's benefit. Tripp's conclusion was based on the following evidence: Mitchell was an Avenue Piru member in the rival gang territory of the Neighborhood Crips when he issued a gang challenge to Kameron, even if only to determine whether Kameron belonged to an enemy gang. Kameron was of an age and race that made him a potential rival gang member and Mitchell attempted to murder him. Tripp opined the crimes benefitted Avenue Piru, even if Kameron was not a member of the Neighborhood Crips, because local Neighborhood Crips members would hear about the shooting, thus instilling fear and intimidation. Younger gang members affiliated with Mitchell's gang who heard about the shooting, and the recognition gained thereby, would be encouraged to commit similar crimes. This incident occurred during a time when a gang war had been going on between the Neighborhood Crips and the Inglewood Bloods gangs, and shootings were quite common.

"Evidence of the defendant's gang affiliation – including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like – can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez, supra,* 33 Cal.4th at p. 1049.) Here, the gang evidence proved Mitchell's motive for committing an otherwise inexplicable assault on Kameron and Erneshia, who had tried to avert any violence by not rising to Mitchell's gang challenge. Mitchell's assault was the functional equivalent of the classic, apparently motiveless, drive-by shooting that is given an understandable context by the presentation of gang culture evidence. (See *People v. Ruiz* (1998) 62 Cal.App.4th 234, 239 [notwithstanding potential prejudicial effect of gang evidence, such evidence is

17

admissible "when the very reason for the crime is gang related"]; *People v. Martin* (1994) 23 Cal.App.4th 76, 81 ["where evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial"].)

"A gang expert may render an opinion that facts assumed to be true in a hypothetical question present a 'classic' example of gang-related activity, so long as the hypothetical is rooted in facts shown by the evidence." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551, fn. 4.) A gang expert may testify on the ultimate question of whether the defendant was acting for the benefit of a gang. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 507-509 [where participants were diverse group affiliated with various gangs, trial court did not abuse its discretion by letting gang expert testify "the participants acted for the benefit of each and every gang represented by the caravan"].) "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[ ] criminal street gang' within the meaning of section 186.22(b)(1). (See, e.g., *People v. Vazquez* (2009) 178 Cal.App.4th 347 . . . [relying on expert opinion that the murder of a nongang member benefited the gang because 'violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, "fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that they may be the gang's next victim or at least retaliated on by that gang" ']; *People v. Romero* (2006) 140 Cal.App.4th 15, 19 . . . [relying on expert opinion that 'a shooting of any African American men would elevate the status of the shooters and their entire [Latino] gang'].)" (*People v. Albillar*, *supra*, 51 Cal.4th at p. 63.)

Based on Tripp's testimony, there was sufficient evidence to establish the "benefit" factor of the benefit/direction/association element of the gang enhancement. (See, e.g., *People v. Galvez* (2011) 195 Cal.App.4th 1253, 1261 ["The crimes were committed for the benefit of the gang because, as . . . explained by [the gang expert], the gang members' act of severely beating [the victim] in a public place in gang territory

'promotes fear, which, in essence, promotes their gang and their brutality to the community in which they live.' "].)

There was also sufficient evidence to establish Mitchell committed the shooting with the specific intent to promote, further, or assist in criminal conduct by gang members. The promote/further/assist element of the gang enhancement is satisfied even if the only gang member whose criminal conduct was furthered was the defendant himself in his commission of the underlying offense. (See *People v. Hill* (2006) 142 Cal.App.4th 770, 774 ["There is no requirement in section 186.22, subdivision (b), that the defendant's intent to enable or promote criminal endeavors by gang members must relate to criminal activity apart from the offense defendant commits. To the contrary, the specific intent required by the statute is 'to promote, further, or assist in *any* criminal conduct by gang members.' (Pen. Code, § 186.22, subd. (b), italics added.) Therefore, defendant's own criminal threat qualified as the gang-related criminal activity. No further evidence on this element was necessary."].)

Mitchell cites *People v. Albarran* (2007) 149 Cal.App.4th 214, as a case "strikingly similar" to his. But *Albarran* is inapposite because there the gang expert basically "testified he did not know why the shooting occurred." (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1333.) In *Albarran*, the defendant and a companion fired shots at a house where a party was going on, but there was no evidence the gunmen had made themselves known by gang signs, announcements or graffiti, and the gang expert "conceded he did not know the reason for the shooting." (*People v. Albarran, supra,* 149 Cal.App.4th at p. 227.) Here, on the other hand, the evidence showed Mitchell made some sort of verbal gang challenge to Kameron before opening fire.

Citing *In re Frank S.* (2006) 141 Cal.App.4th 1192, Mitchell argues: "Except for the gang expert's general assertion that firing on Kameron would tend to instill fear in the Neighborhood Crips, there was no evidence that appellant fired in order to benefit the [Avenue Piru] gang. The motive for the shooting is simply not known. The fact that there was no known motive for the shooting, does not give rise to a legitimate inference that it must have served the purposes of some gang. The gang expert's thesis, apparently,

19

is that appellant was a gang member because he associated with them. If he fired on Kameron, he must have done so to advance his gang and denigrate the Neighborhood Crips. This is a chain of inference even weaker than that presented in *Frank S.*"

But *Frank S.* was decided by the same Court of Appeal that decided *People v. Killebrew* (2002) 103 Cal.App.4th 644, where "in response to hypothetical questions, the People's gang expert exceeded the permissible scope of expert testimony by opining on 'the subjective *knowledge and intent* of each' of the gang members involved in the crime. [Citation.] Specifically, he testified that each of the individuals in a caravan of three cars knew there was a gun in the Chevrolet and a gun in the Mazda and jointly possessed the gun with everyone else in the three cars for mutual protection. [Citation.] [However,] *Killebrew* does not preclude the prosecution from eliciting expert testimony to provide the jury with information from which the jury may infer the motive for a crime or the perpetrator's intent; *Killebrew* prohibits an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550-1551.) As our Supreme Court has said: "Obviously, there is a difference between testifying about specific persons and about hypothetical persons. It would be incorrect to read *Killebrew* as barring the questioning of expert witnesses through the use of hypothetical questions regarding hypothetical persons. . . . [U]se of hypothetical questions is proper." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946, fn. 3.)

*Frank S.* rejected an expert opinion because, "[s]imilar to *Killebrew*, the expert . . . testified to 'subjective knowledge and intent' *of the minor.* [Citation.] 'Such testimony is much different from the expectations of gang members in general when confronted with a specific action.' " (*In re Frank S., supra,* 141 Cal.App.4th at pp. 1197-1198, italics added and omitted.) The crucial point is the difference between testifying about the particular defendant's mental state rather than the mental state of gang members in general. Here, Tripp was asked and answered a detailed hypothetical question based on the facts of this case.

There was sufficient evidence to sustain the gang enhancement.

3. *Great bodily injury enhancement term must be stayed*.

Mitchell contends, and the Attorney General properly agrees, that the trial court erred by imposing on count 1 (the attempted murder of Kameron) both a term of 25 years to life under section 12022.53, subdivision (d), for discharging a firearm and causing great bodily injury, *as well as* a three-year term for causing great bodily injury under section 12022.7. Mitchell asserts the remedy for this error is to strike the sentence imposed under the great bodily injury enhancement (§ 12022.7), but the Attorney General argues the correct remedy is to reverse the section 12022.7 enhancement finding. The proper remedy, however, is to merely stay imposition of the great bodily injury enhancement term.

Section 12022.53, subdivision (f), provides: "Only one additional term of imprisonment under this section shall be imposed per person for each crime. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment. An enhancement involving a firearm specified in Section 12021.5, 12022, 12022.3, 12022.4, 12022.5, or 12022.55 shall not be imposed on a person in addition to an enhancement imposed pursuant to this section. An enhancement for great bodily injury as defined in Section 12022.7, 12022.8, or 12022.9 shall not be imposed on a person in addition to an enhancement imposed pursuant to subdivision (d)."

This statute has been construed by our Supreme Court as follows: "[I]t becomes apparent that section 12022.53 was enacted to ensure that defendants who use a gun remain in prison for the longest time possible and that the Legislature intended the trial court to stay, rather than strike, prohibited enhancements under section 12022.53. As noted above, staying rather than striking the prohibited firearm enhancements serves the legislative goals of section 12022.53 by making the prohibited enhancements *readily* available should the section 12022.53 enhancement with the longest term be found invalid on appeal and by making 'the trial court's intention clear – it is staying part of the sentence only because it thinks it must. If, on the other hand, the trial court were to strike or dismiss the prohibited portion of the sentence, it might be misunderstood as exercising

21

its discretionary power under Penal Code section 1385.'[8] [Citation.] When the word 'impose' in section 12022.53(f) is properly understood as shorthand to mean impose and then execute, section 12022.53 allows for the same resolution of the prohibited enhancements under sections 12022.53 and 12022.5, namely, that they must be imposed and then stayed." (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1129-1130, fn. omitted.)

In *Gonzalez*, the trial court imposed firearm enhancements for each of the three section 12022.53 subdivisions,[9] as well as an enhancement for a section 12022.5 firearm use finding. Our Supreme Court held: "[W]e construe section 12022.53 to require that, after a trial court imposes punishment for the section 12022.53 firearm enhancement with the longest term of imprisonment, the remaining section 12022.53 firearm enhancements and any section 12022.5 firearm enhancements that were found true for the same crime must be imposed and then stayed." (*People v. Gonzalez*, *supra*, 43 Cal.4th at pp. 1122-1123.) Similarly, in the case at bar, the redundant section 12022.7 great bodily injury enhancement imposed on Mitchell must be stayed.

Accordingly, we will stay the three-year section 12022.7 enhancement term imposed in connection with count 1.

---

[8] Section 1385, subdivision (a), provides, in pertinent part: "The judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed."

[9] Section 12022.53 prescribes sentence enhancements for specified felonies in three escalating situations: 10 years for use of a firearm under subdivision (b); 20 years for discharging a firearm under subdivision (c); and 25 years to life for discharging a firearm and causing great bodily injury or death under subdivision (d).

## DISPOSITION

The three-year section 12022.7 enhancement term imposed in connection with count 1 is hereby stayed. As modified, the judgment is affirmed. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



KITCHING, J.



ALDRICH, J.

23